USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __8/13/2021__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

   -against-

NACHMAN HELBRANS and MATITYAU MOSHE MALKA,

                      Defendants.

19-CR-497-01 (NSR)
19-CR-497-05 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

This case involves the alleged kidnapping of two minors ("the Minors") from their Mother in New York, by members of a religious community currently based in Guatemala—Lev Tahor—of which the Mother and the Minors were previously a part. Specifically, Defendants Nachman Helbrans and Matityau Moshe Malka,[1] and their Co-Defendants are charged by indictment with, among other things, various counts of international parental kidnapping and conspiracy to commit international parental kidnapping. (ECF Nos. 49, 52, 229.)

Currently before the Court are motions to suppress (1) Helbrans's statements to law enforcement on December 28, 2018, and (2) Malka's statements to law enforcement on March 26, 2019. (ECF Nos. 120 and 123.) For the following reasons, the Court DENIES both motions.

## BACKGROUND

The Court summarizes only the factual and procedural history relevant to the suppression motions. A more fulsome background and procedural history of this matter can be found at the Court's opinion and order on the other pre-trial motions at ECF No. 287.

---

[1] All references in this Opinion and Order to "Malka" are to Defendant Number 5, Matityau Moshe Malka. Defendant Number 9, Mordechay Malka is not referred to by name herein.

In early November 2018, the Mother left the Lev Tahor community in Guatemala with three of her children, including the Minors, and relocated to New York where she was subsequently joined by her other three children. (Superseding Indictment ("S2") ¶ 8 (ECF No. 229).) On November 14, 2018, the Kings County Family Court (in Brooklyn, New York) issued orders granting the Mother sole custody of her six children and enjoining the father from contacting the children. (*Id.*) At approximately 3:00 A.M. on or about December 8, 2018, Helbrans and others kidnapped the Minors—then fourteen and twelve—from a home in Woodridge, New York. (S2 ¶ 10.) Helbrans and the Minors, dressed in secular clothing and using passports bearing the names of two of Helbrans' children, proceeded through airport security in Scranton, flew to Washington, D.C., then to Texas, and then took a bus across the border to Mexico. (S2 ¶ 11.)

On or about December 18, 2018, Mexican law enforcement raided a house Mexico, and detained Helbrans, Malka, and three others. (Helbrans Ex. B ("FBI Report"), at USAO_009834-USAO_35.) On December 19, 2018, an Assistant Legal Attaché ("ALAT") with the Federal Bureau of Investigation ("FBI") attempted to interview the five detained individuals, including Helbrans, but "they either claimed to have no knowledge of the whereabouts or ways to contact [the Minors], or declined to speak with [the] ALAT." (*Id.* at USAO_009837.)

On or about December 27, 2018, the Minors were recovered in a hotel in Mexico. (S2 ¶ 13; FBI Report at USAO_009840.) Also on December 27, 2018, two Mexican immigration officials accompanied Helbrans, Malka, and two Co-Defendants on a commercial flight from Mexico City to New York. (FBI Report at USAO_009840.) The FBI arrested Helbrans and the two Co-Defendants upon their arrival at John F. Kennedy International Airport and took them to an FBI office in New Windsor, New York. (*See* Minute Entries dated December 27, 2018.) Malka was

not arrested at that time. Malka was arrested on March 26, 2019. (*See* Minute Entry Dated March 26, 2019.)

Helbrans and Malka filed counseled[2] pretrial motions on in November 2020. (ECF Nos. 120 and 123; *see* "Helbrans Mem." ECF No. 122; "Matityau Mem." ECF No. 123; and "Matityau Reply" ECF No. 191.) Co-Defendants also filed counseled pre-trial motions. (ECF Nos. 125, 131.) The Government opposed these motions. ("Opp'n Mem," ECF No. 169.)

The Court resolved all of the counseled pre-trial motions except Helbrans and Malka's suppression motions in an Opinion and Order issued July 8, 2021. (ECF No 287.)

## LEGAL STANDARDS

### I. <u>Motions to Suppress</u>

"The Government bears the burden of proof" on a motion to suppress. *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008). The Government must justify the constitutionality of its actions "by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

Evidentiary hearings on motions to suppress are only required "if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact [exist]." *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005). District courts have required the defendant, and not merely his or her counsel, to submit an affidavit to demonstrate that a factual dispute exists requiring a suppression hearing. *See, e.g. United States v. Caruso,* 684 F. Supp. 84, 87 (S.D.N.Y. 1988) (denying motion to suppress and declining to hold a

---

[2] Since the pre-trial motions were filed, the Court head hearings on and then granted Helbrans, Matityau Moshe Malka, and three Co-Defendants' requests to represent themselves pro se. (ECF Nos. 183, 194, 196, 198, 271.)

3

hearing to address factual disputes presented in moving papers that were not supported by an affidavit from someone with personal knowledge).

## II.     Admissibility of Statements to Law Enforcement

Under *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Specifically, law enforcement must "advise a suspect that 'he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *United States v. Schaffer*, 851 F.3d 166, 173 n.23 (2d Cir. 2017) (quoting *Miranda*, 384 U.S. at 444).

"'[C]ustody' for Miranda purposes is not coterminous with . . . the colloquial understanding of custody." *United States v. FNU LNU*, 653 F.3d 144, 152-53 (2d Cir. 2011). The test for determining custody is an objective inquiry that asks (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994) and *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). The first prong is often referred to as the "free-to-leave inquiry," and is considered a "necessary, but not determinative, first step in establishing *Miranda* custody." *Newton*, 369 F.3d at 670.

> If the answer [to the free-to-leave inquiry] is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis is required . . . . In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. Only if the answer to this second question is yes was the person "'in custody' for practical purposes," and "entitled to the full panoply of protections prescribed by *Miranda*."

*Id.* at 72 (citations omitted). In other words, if a defendant is not in "custody" then it is a "consensual encounter" during which an "officer[ ] may permissibly ask questions." *United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996) (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

If the individual was "in custody," then a court considers whether any statements were the product of "interrogation." "Absent an interrogation, there can be no infringement of the Fifth Amendment rights *Miranda* was designed to protect." *Jackson v. Conway*, 763 F.3d 115, 137 (2d Cir. 2014) (citing *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)). Interrogation occurs "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of an interrogation amounts to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from [a defendant]." *Id.* at 301. By contrast, there is no interrogation where a defendant's statements "were not made in response to any purported questioning or its functional equivalent." *United States v. Hashmi*, No. 06 CRIM. 442(LAP), 2009 WL 2496272, at *5 (S.D.N.Y. Aug. 7, 2009). A defendant's voluntary incriminating statements made while the defendant is in custody are admissible. *United States v. Compton*, 428 F.2d 18, 22 (2d Cir. 1970).

## DISCUSSION

### I. Helbrans' Motion to Suppress

Helbrans avers that any statements he made to law enforcement on December 28, 2018 were elicited in contravention of *Miranda* and further that, if the Court declines to suppress the statements, since the videotape of his statements on that date was not preserved, lost, or destroyed through Government negligence or willful conduct, the Court should issue an adverse inference jury instruction on the spoliation of such evidence at trial. The Government avers that any

statements Helbrans made on December 28, 2018 are admissible because they were not made in response to any questioning—that the statements were an admissible spontaneous utterance—and that the interview was discontinued and the agents left the interview room after Helbrans refused to sign the Advice of Rights form waiving his *Miranda* rights.

### A. Helbrans's Statements on December 28, 2018

The Interview Session Report indicates that wall switch operator initiated a recording at 12::31:14 A.M. on December 28, 2018 and terminated it at 12:32:15 A.M. on December 28, 2019, approximately one minute later. (Helbrans Ex. E (DOJ/FBI Interview Session Report, dated July 25, 2019).) The minute-long video, which the Court reviewed, shows two individuals enter an interview room, then leave, and then one of the individuals returns to the room with Helbrans and begins removing Helbrans's handcuffs, at which time the video stops. (*See* Helbrans Ex. D (December 28, 2018 video)).

Two FBI agents, Special Agent Jessica Miller and Task Force Officer Jason Gore, attempted to interview Helbrans. Handwritten notes and official FD-302 form filled out by Agent Miller document Helbrans' exercise of his right to "advisement from an attorney before he talks about this case" and that Helbrans stated: (i) that he was willing to take responsibility for his actions in this case if he was guilty of doing something, but wanted reassurance that other people who were arrested will not have to take responsibility, (ii) that he feels the newspaper has said things about this case that were not right, (iii) that he is the Rabbi and if he told people in the community to do things, then he will take responsibility for that, and (iv) that he was talking about the case with "the kids." (Helbrans Ex. F, USAO_0009 and USAO_0010.)The Advice of Rights form is dated December 28, 2018 at 1:22 A.M and bears only the signature of a witness who signed at 1:26 A.M. (Helbrans Ex. G, USAO_0009.)

### B. Admissibility of Helbrans's Statements

Helbrans argues in a wholly cursory fashion that any statements he made on December 28, 2018 were the product of custodial interrogation. The Court agrees that Helbrans was "in custody" on December 28, 2018; however, Helbrans has merely relied on "bald assertions" that his statements were the product of interrogation "[w]ithout specification of the factual basis" that supports suppression. *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998). Critically, Helbrans did not submit an affidavit in support of his motion, and "without a supporting affidavit of someone with personal knowledge of the underlying facts, the court need not resolve factual disputes that may be presented by the moving papers." *Caruso,* 684 F. Supp. at 87.

The Government, on the other hand, relies on the FD-302 form, in which Agent Miller indicates that "HELBRANS made these comments after he was read his rights and then prior to his refusal to sign the FD-395 (ADVICE OF RIIGHTS)." In other words, the Government's contention that any statements Helbrans made were not in response to interrogation is supported by record evidence. In sum, Helbrans has failed to raise a factual dispute regarding the admissibility of his statements.

To the extent that Helbrans takes issue with the Government's characterization of his statements, he has not enumerated any such issues with the contemporaneous agent notes or on the FD-302 form.[3]

Insofar as Helbrans takes issue with the fact that he was not read his *Miranda* rights until he was in custody in the United States approximately ten days after he was detained by Mexican authorities, the Court has already denied Helbrans' motion to dismiss based on alleged removal

---

[3] Additionally, Helbrans declined to file a reply memorandum of law in support of his motion and therefore has not contested in any way the Government's characterization of Helbrans' statements in its opposition memorandum.

from Mexico without lawful process (*see* ECF No. 287 at 25), and Helbrans has not identified or challenged the admissibility of any statements he made to law enforcement prior to December 28, 2018.

Accordingly, Helbrans' motion to suppress statements he made on December 28, 2018 is DENIED.

### C. Adverse Inference Instruction

Helbrans avers that if the Court declines to suppress the statements, it should provide an adverse inference inference instruction at trial. "A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *United States v. Garcia*, 596 F. App'x 24, 26 (2d Cir. 2015) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir. 2002)).

The Government avers that "[t]he interview was inadvertently not recorded, apparently because someone moved a switch on the wall to the 'off' position." (Opp'n Mem. at 66 n.16.) Adverse inference instructions are generally not necessary where evidence was destroyed by the Government by mistake prior to trial. *See, e.g. Magassouba v. United States*, No. 03 CR 985 RPP, 2013 WL 5780767, at *5 (S.D.N.Y. Oct. 25, 2013) ("Neither the Supreme Court nor the Second Circuit has ever held that a defendant is entitled to an adverse-inference jury instruction when the Government has produced evidence showing that [material evidence] has been destroyed by mistake prior to trial."); *cf. United States v. Greenberg*, 835 F.3d 295, 303 (2d Cir. 2016) (affirming denial of motion to dismiss based on spoliation of evidence where "record [was]devoid of evidence

8

that the Government acted in bad faith in failing to preserve the data" and noting that "where the Government has . . . failed to preserve evidentiary material that is 'potentially useful,' such failure does not violate due process *unless a criminal defendant can show bad faith*' on the part of the Government" (emphasis in original) (quoting *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004)). Helbrans' assertions in his moving papers that the lack of or destruction of the video of his December 28, 2018 interview was in bad faith are wholly conclusory.

It appears unlikely that the statements Helbrans made on December 28, 2018 are critical to the Government's case, and therefore it is unclear whether the Government intends to rely on them at trial. Since it is unclear whether the Government will rely upon these statements at trial, the Court finds that it would be premature to consider the necessity of an adverse inference instruction at this time. If the Government includes exhibits related to these statements on its Exhibit List or indicates that it intends to call witnesses to testify regarding these statements, Helbrans may renew his request for an adverse inference instruction in a motion *in limine* or during trial, as appropriate.

## II.     Malka's Motion to Suppress

Malka moves to suppress statements he made to law enforcement on March 26, 2019 before his *Miranda* rights were read and he was subsequently arrested. He admits that he willingly went to the station to provide additional information regarding a harassment complaint he filed. However, he seems to aver that the entire interview should be considered custodial or at least that any statements he made were improperly coerced and therefore involuntary because, unbeknownst to him, he was already under investigation by the FBI, and the invitation to discuss his complaint was pretextual. The Court disagrees.

**A. Malka's Statements**

On March 25, 2019, Special Agent ("SA") Jonathan Lane provided an agent affidavit in support of the Government's application for a warrant for cellphone location and pen register information for a number associated with Malka. (Ex. E to Matityau Motion, USAO_007313- USAO_007322, (ECF No. 123-5).)

Also on March 25, 2019, Malka filed a complaint with the New York City Police Department ("NYPD") in Williamsburg, Brooklyn alleging that he has been harassed by various nonparties. NYPD Detective and FBI Task Force Officer Tony Curtain ("Officer Curtin") called Malka to discuss his complaint and offered to meet in person. Malka went to the NYPD precinct in the Borough Park neighborhood of Brooklyn, New York (hereinafter "the station"). When he arrived, he was taken to an interview room where he was spoke with Officer Curtin and SA Caulfield.

The Court has reviewed the video and audio from the interview room, which was taken just after midnight in the early morning of March 26, 2019, and summarizes the contents and circumstances of Malka's statements to Officer Curtin and SA Caulfield as follows.[4]

The video begins with an empty interview room. There are voices in the background, but they are not intelligible. Officer Curtin, SA Caulfield, and Malka enter the interview room and Malka asks whether the officers speak Yiddish, to which Officer Curtin replies in the negative. Once seated at the table, Officer Curtin asks "how are you doing," to which Malka responds "not so good." When Malka asks whether SA Caulfield was Officer Curtain's "helper" or assistant, Officer Curtin replies in the affirmative.

---

[4] The video file indicates that the recording started at 12:06:04 AM and concluded at 1:13:47 AM on March 26, 2019. The file, which was provided to the Court by the Government, contains three video angles corresponding with audio.

Malka asks why the meeting is taking place in Borough Park when he submitted the complaint in Williamsburg. Officer Curtin responds that they are doing a bigger investigation into "the guys" that Malka complained about, who are active in Borough Park as well as Williamsburg.

Officer Curtin confirms some preliminary information including Malka's name, that he lives in Guatemala, where he is currently staying in the United States, that he has been in the United States for a few weeks, that he had previously lived in the United States, and that the number at which Officer Curtain had called Malka is his phone number. Officer Curtin then asks whether the problem Malka has with the alleged harassers just started or began before. Malka responds that it is a "whole story," to which Officer Curtin says "we've got time."

Malka proceeds to describe the context of the disputes between the Lev Tahor community and other Jewish communities and individuals going back about twenty-five years. He alleges that because of his membership in Lev Tahor, certain individuals beat him in September 2015 and temporarily detained and made threats against him again recently, in March 2019. When Malka mentions the name of one of the alleged harassers, Officer Curtin responds "he's one of the guys I am looking at."

About twenty-five minutes into the discussion, there is a knock on the door and SA Caulfield leaves the room for less than a minute. When SA Caulfield returns, she states that someone else will need to use the room in a little while so Malka should move on to discussing the immediate events precipitating his complaint.

Before discussing the current incidents, Malka alleges that his harassers also pressured and financed the Mother to leave Lev Tahor with her children, including the Minors. Malka acknowledges that Helbrans and others are currently detained and alleges that the Government brought charges against them under pressure from the same individual or individuals that have

been harassing Malka. Nearly forty minutes into the discussion, Officer Curtin redirects Malka's attention away from the alleged kidnapping and back to Malka's harassment complaint.

After Malka describes the recent events that led to his complaint, SA Caulfield askes Malka how the harassment relates to the kidnapping of the Minors and specifically why, if the alleged harassers have the Minors, they are still being so aggressive towards Malka and other members of Lev Tahor. Malka responds that the object of the harassers is to diminish or get back at Lev Tahor, not just to have the Minors away from the community.

During the course of the discussion, Malka consults a notebook or diary a few times and also retains his telephone, which he answers approximately thirty minutes into the interview, speaking in Yiddish into the phone for less than ten seconds.

Nearly fifty minutes into the interview, there is another knock at the door and SA Caulfield again leaves. SA Lane and Officer Polowin come into the room and SA Caulfield and Detective Curtin leave. SA Lane identifies himself and Officer Polowin as members of the FBI and reads Malka his *Miranda* rights, which he characterizes as "normal rules." Other than stating that he does not understand why the FBI and not the local police are involved, Malka states that he understands his rights and chooses to be silent. Malka does not make any further statements.

SA Lane opines that Malka is in the United States under the direction of other people and is in a "tough spot" and provides Malka the opportunity to provide his side of the story regarding interventions with the Mother's custody of her children. SA Lane explains, *inter alia*, that efforts to remove the Minors from their Mother—who has custody pursuant to a court order—has nothing to do with harassment of Malka by the alleged harassers and encourages Malka to cooperate with the Government. When Malka again refuses to speak, he is placed under arrest.

### B. Admissibility of Malka's Pre-Arrest Statements

Based on its review of the audio and video of the interview, and the parties' submissions, the Court concludes that Malka was not in custody at the time that he made statements to Officer Curtin and SA Caulfield nor were his statements taken in violation of his constitutional rights.

Based on its review of the video, the Court is persuaded that a reasonable person in Malka's position during the interview with Officer Curtin and SA Caulfield would have felt free to leave at any time. Malka lodged a complaint with the NYPD, arrived at the station of his own volition, was not restrained in any way during the interview, and was permitted to keep and use his cellular phone during the course of the interview. Officer Curtin and SA Caulfield were cordial and allowed Malka to guide the conversation by mostly asking specific clarifying questions confirming names, contact information, dates, and locations and patiently listening as Malka explained the lengthy context of his complaint. Further, Officer Curtin and SA Caulfield were in plain clothes and neither had guns drawn or seemingly visible. While neither Officer Curtin nor SA Caulfield explicitly told Malka that he was not under arrest, the Court is confident that a reasonable person in Malka's position would have felt free to leave or terminate the discussion with Officer Curtin and SA Caulfield, who said nothing to indicate that the meeting was related to anything other than Malka's complaint. *See Campaneria v. Reid,* 891 F.2d 1014, 1020 n.1 (2d Cir. 1989) (concluding that defendant was not in custody, in part, because "the officers had not physically or verbally indicated to [the defendant] that he was not free to leave" and "the officer's unexpressed intent is not controlling").

Malka's apparent claim that there can be no consensual encounter with law enforcement once one is considered by law enforcement to be a suspect completely ignores settled precedent. The Supreme Court has explained that

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

*Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). "*Miranda* warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted).

Insofar as Malka argues that the Government's suspicions that Malka was involved in international parental kidnapping conspiracy—as evidenced by the agent affidavit SA Lane provided on March 25, 2019—converted a consensual encounter into a custodial one, he is mistaken. "[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda.*" *Stansbury*, 511 U.S. at 324. A questioning officer's subjective "beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Id.* at 325 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 440 (1984)). Where, as here, neither SA Caulfield nor Officer Curtin disclosed in any way during their discussion that Malka was suspected in the international parental kidnapping conspiracy, neither their nor any other officer's "views or beliefs were . . . manifested to the individual under interrogation [such that they] would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Id.*

Malka also seems to contend that because he was a suspected participant in an international parental kidnapping conspiracy prior to the interview, any interaction with law enforcement that did not expressly disclose this fact was unduly coercive.[5] Statements made in response to "trickery and deception" by law enforcement may amount to "violation of the Due Process Clause of the Fifth Amendment so as to render the incriminating statements . . . involuntary and inadmissible even if *Miranda* warnings were not required." *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992). "[T]he test of voluntariness . . . is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *Id.* (internal quotation marks omitted). However, the Supreme Court has rejected the contention that "even though [a defendant] voluntarily engaged in the interview with police, his participation was 'coerced' because he was unaware of the consequences of his participation." *California v. Beheler*, 463 U.S. 1121, 1125 n.3 (1983). Malka has neither provided an affidavit attesting that Officer Curtin and SA Caulfield overbore his free will or cited any "authority to support his contention that his lack of awareness transformed the situation into a custodial one." *Id.*

---

[5] Malka's claimed obliviousness to the possibility that he was under suspicion in the international parental kidnapping investigation strains credulity. Malka was detained in Mexico in December 2018 and stated during the interview that he was aware that Helbrans and others continued to be detained related to the kidnapping charges. In any event, the "in-custody" inquiry does not depend "on what [defendant] thought or should have thought, but rather on what a reasonable person would have felt under the circumstances of the interrogation." *U.S. ex rel. Mahler v. Perez*, No. 06 CV 5109 ARR, 2007 WL 1825403, at *7 (E.D.N.Y. June 21, 2007) (rejecting habeas petitioner's contention that "in her mind she was in custody from the moment that she arrived at the state police barracks because she indicated upon her arrival that she would not be free to pick up her daughter that afternoon , which she believed meant that the troopers should have understood that she "was about to incriminate herself about something that would cause her arrest").

Accordingly, Malka was not in custody during his discussion with Officer Curtin and SA Caulfield and has not plausibly alleged any other deficiency that would warrant suppression of his pre-arrest statements. Therefore, Malka's motion to suppress his pre-arrest statements is DENIED.

## CONCLUSION

For the foregoing reasons, the motions to suppress are DENIED.

Standby counsel for Helbrans and Malka are directed to serve a copy of this Opinion and Order on their respective pro se Defendants and to file proof of service on the docket.

The Clerk of Court is directed to terminate the motion at ECF No. 123.

Dated: August 13, 2021  
      White Plains, NY

SO ORDERED:

HON. NELSON S. ROMAN  
UNITED STATES DISTRICT JUDGE