UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                         :

UNITED STATES OF AMERICA          :

                                         :

     - v. -                     :            S3 19 Cr. 497 (NSR)

                                         :

NACHMAN HELBRANS,           :

                                         :

            Defendant.         :

                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Sam Adelsberg
Jamie Bagliebter
Jim Ligtenberg
Daniel Tracer
Assistant United States Attorneys,
*- Of counsel -*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. 2

PRELIMINARY STATEMENT ............................................................................... 3

BACKGROUND ........................................................................................................ 4

    *A.   2017 — Early 2018: Nachman Helbrans Assumes Control of Lev Tahor and Forces 13-Year-Old Jane Doe into an Illegal Marriage With an Adult.* ................................................ 4

    *B.   Early 2018 — November 2018: Jane Doe's Mother Escapes Lev Tahor and Jane Is Rescued From Lev Tahor by Law Enforcement* ....................................................................... 5

    *C.   November 2018 — December 2018: Helbrans Develops a Plan to Kidnap Jane and John Doe and Sets in Motion Preparations for the Kidnapping.* ............................................. 6

    *D.   December 2018: Helbrans Leads the Kidnapping of Jane and John Doe and Flees With the Children to Mexico* ................................................................................................................ 8

    *E.   March 2019: Helbrans again attempts to kidnap Jane while imprisoned on kidnapping charges.* .......................................................................................................................................... 9

PROCEDURAL HISTORY ..................................................................................... 10

DISCUSSION ............................................................................................................. 12

    I.   Applicable Law ................................................................................................. 12

    II.   A Significant Incarceratory Sentence in Warranted .................................... 13

       *A.   The Nature and Circumstances of the Defendant's Crimes* ............................ 13

       *B.   History and Characteristics of the Defendant* ................................................. 15

       *C.   The Need to Promote Respect for the Law* ...................................................... 15

       *D.   The Need for Adequate Deterrence* .................................................................. 17

       *E.   Helbrans Sentencing Arguments Do Not Warrant A Reduced Sentence* ...... 18

CONCLUSION ......................................................................................................... 23

## PRELIMINARY STATEMENT

In December 2018, Nachman Helbrans spearheaded the kidnapping of two children—ages 12 and 14—in the middle of the night from their mother.  In direct contravention of a clear family court order, he took the children from New York, provided them disguises, and brought them to a nearby airport where, using fake identities, they boarded one of several flights that took them to southern Texas.  Traveling by land, they then crossed the U.S.-Mexico border.

Once in Mexico, Jane Doe—the 14 year old—was brought back to an adult man Helbrans had forced her to marry, a marriage that was illegal in Guatemala.  Indeed, the two had been married for nearly a year on Helbrans' and his leadership team's orders, having sex at required times per the rules of Lev Tahor.  Because of Helbrans' brazen kidnapping, this teenager would be brought back to the clutches of the sect, to her child marriage, and to an illicit sexual relationship with an older man.  After an international manhunt spanning weeks and involving hundreds of law enforcement officers in state, local, and foreign jurisdictions, the children were recovered and Helbrans and several of his co-conspirators were arrested.

Undeterred by his arrest, Helbrans' appalling conduct did not end there. A few months later, in March 2019, he picked up right where he left off and tried to kidnap the young girl again— this time operating from his jail cell in Westchester County.  Once again, only thanks to the intervention of law enforcement, Helbrans' plans were thwarted.

A significant sentence is necessary to reflect the seriousness of the offenses, to promote respect for the law, and to deter Helbrans and others who would also seek to kidnap children, smuggle them across borders, and place them in illegal sexual relationships.  Accordingly, as discussed more fully below, the Government asks the Court to impose a sentence within the applicable Guidelines range of 292 to 365 months' imprisonment.

**BACKGROUND**

### A. 2017 — Early 2018: Helbrans Assumes Control of Lev Tahor and Forces 13-Year-Old Jane Doe into an Illegal Marriage With an Adult

Nachman Helbrans ("Helbrans" or the "defendant") and his co-defendant, Mayer Rosner ("Rosner"), are leaders of an ultra-Orthodox Jewish sect called Lev Tahor. (Presentence Investigation Report ("PSR") ¶ 14). The sect was founded in the 1980s by Helbrans' father, Shlomo Helbrans, who led the group until his death in 2017. (*Id.*). After Shlomo Helbrans' death, Helbrans took over as Lev Tahor's leader. (*Id.*). Helbrans and Rosner, among others, were known within the community as the "Hanhala," or management, of Lev Tahor. (*Id.*). Helbrans established the rules for the community and, together with the Hanhala, managed the operational affairs of the community. (*Id.*). These community rules covered every aspect of the lives of Lev Tahor's adherents, including their studies, their daily schedules, their interactions with family members and other members in Lev Tahor, their interactions with individuals outside of Lev Tahor, and their diets. (*Id.*). In particular, Helbrans, Rosner and the rest of the Hanhala exercised absolute control over marriage and sex in the community. (*Id.*).

With respect to marriage and sex, Helbrans, Rosner and other members of the Hanhala decided who got married and when. (*Id.* ¶ 15). They also had a practice of marrying off girls as young as 12 years old, often to adult men. (*Id.*). Underage weddings were often conducted in secret to hide the ages of brides. (*Id.*). Helbrans and Rosner played prominent roles in these weddings of underage girls—Helbrans often officiated the weddings and Rosner sang to celebrate the couples. (*Id.*).

Married couples living within Lev Tahor—including those involving minors—were required to have sex. (*Id.* ¶ 16). The Hanhala controlled when and how young brides had sex. (*Id.*). They prescribed the days of the week and month that couples were required to have sex,

what sexual positions they were permitted to use, and what they should wear during sex.  (*Id.*).
They also kept track of teenage girls' menstrual cycles and encouraged adult grooms to use alcohol
and erectile disfunction drugs to have sex with them.  (*Id.*).  Helbrans also ordered pregnant women
to give birth in their tents to hide that child brides were required to have sex.  (*Id.*; Trial Tr. 669).
Helbrans and Rosner also ensured that members of Lev Tahor knew that disobeying the Hanhala's
commands when it came to marriage and sex could result in serious punishment, such as having
children removed from the home or being forbidden to speak with family.  (PSR ¶ 16).  The leaders
regularly separated children from their families and husbands from their wives for minor
infractions.  (*Id.*).

In early 2018, Helbrans and Rosner required a 13-year-old girl ("Jane Doe") to religiously
marry Jacob Rosner ("Jacob"), who is a co-defendant of Helbrans and was 19-years-old at the time
of the wedding.  (*Id.* ¶ 17).  Jane is Helbrans' niece and Jacob is the son of co-defendant Mayer
Rosner.  (*Id.*).  Jane and Jacob were not legally married, as marriage of a 13-year-old is illegal in
Guatemala.  (*Id.*).  Jane's mother, Sara Helbrans (Nachman Helbrans' sister), objected to Jane's
wedding but was unable to stop it from occurring.  (*Id.*).  As a married couple, Jane and Jacob were
required to have sex, and they did, in fact, have sex.  (*Id.*).  They had sex for the first time the day
after their wedding and then regularly thereafter as mandated by the Hanhala.  (*Id.*).

## B. Early 2018 ─ November 2018: Jane Doe's Mother Escapes Lev Tahor and Jane Is Brough to New York

After Jane's wedding, Sara's relationship with Helbrans and the Lev Tahor leadership
became strained.  (*Id.* ¶ 18).  As a result, Sara was punished.  (*Id.*).   Helbrans, Rosner, and the
other members of the Hanhala removed Sara's children and husband from her home.  (*Id.*).  They
also banned every member of Lev Tahor from talking to her, except for the Hanhala and two
women, one of which was Mayer Rosner's wife.  (*Id.*).  Ultimately, Sara decided to leave Lev

Tahor as a result.  (*Id.*).  Initially, she took three of her children with her to New York when she left, but was unable to take her other three children, including Jane.  (*Id.*).  After Sara left Lev Tahor, members of the Hanhala instructed Jane on what steps to take if she was removed from Lev Tahor.  (*Id.*).  They instructed her that if anyone asked her, she should lie and say that her mother, Sara, beat her.  (*Id.*).

A short time after Sara left Lev Tahor, Jane's father, who is also a member of Lev Tahor, took Jane and her other siblings who were still in Guatemala to Mexico in an effort to fraudulently obtain passports for the children.  (*Id.* ¶ 19).  As a result, Jane, her then-12-year old brother ("John Doe") and a third sibling were taken by law enforcement and reunited with their mother, Sara, in New York.  (*Id.*).

On November 14, 2018, Sara obtained a court order from Kings County Family Court granting her custody of all six of her children, including Jane Doe and John Doe.  (*Id.* ¶ 20).  Sara also obtained a protective order that prevented the father of the children from communicating with the children.  (*Id.*).  Nachman Helbrans and Mayer Rosner were aware of these orders.  (*Id.*).

## C. November 2018 – December 2018: Helbrans Develops a Plan to Kidnap Jane and John Doe and Sets in Motion Preparations for the Kidnapping.

Helbrans and Rosner, as top leaders in Lev Tahor, then devised a plan to kidnap Jane and John to bring them back to the Lev Tahor community, and specifically to reunite Jane with her husband, Jacob, to enable Jane to continue having sex with Jacob.  (*Id.* ¶ 22; Trial Tr. 679).  To ensure its success, Helbrans and Rosner directed others within the group to execute on the plan. (PSR ¶ 22).

At the Hanhala's direction, several members of the group—Shmiel Weingarten, Jacob Rosner, Aron Rosner, Mordechay Malka and Shimon Malka—met in Brooklyn, New York on December 5, 2018.  (*Id.* ¶ 23).  At this time, Helbrans and Rosner were in Mexico together and

were in communication with the other co-conspirators.  (*Id.*).  Shmiel Weingarten stated during the meeting that Helbrans instructed them to take an oath of silence on a religious article to promise to never talk about the kidnapping to anyone again.  (*Id.*).  During this meeting, Shmiel Weingarten also told Shimon Malka that if he helped with the kidnapping, Helbrans would pray for Malka and that his past—namely, his decision to leave Lev Tahor—would be forgiven.  (*Id.*).  Malka understood this to mean that he would be re-united with his wife, who had been forbidden by the Hanhala from talking to Malka since he left the community two months earlier.  (*Id.*).  The group also received burner phones and aliases and were instructed to only use an encrypted application to communicate.  (*Id.*).  In addition, during this meeting, Shmiel Weingarten called Mayer Rosner and discussed the kidnapping plan with him.

The following morning, on December 6, 2018, Shmiel Weingarten, Jacob Rosner, and Mordechay Malka went to Walmart to buy disguises for the kidnapping.  (*Id.* ¶ 24).  They bought secular clothing for the kids, for themselves, and for Helbrans.  (*Id.*).  The purpose of the disguises was to make it more difficult for law enforcement to identify the children and the kidnappers during the kidnapping.  (*Id.*).  Later that day, Mordechay Malka rented a silver Nissan Rogue to use as the get-away car for the kidnapping.  (*Id.*).  That evening, Shimon Malka, Shmiel Weingarten, Mordechay Malka, and Jacob Rosner met again.  At this meeting, Shmiel told the others that someone nicknamed "Mishul" would come to transport the kids on flights to the border of Mexico, where they would then cross over by land.  (*Id.*).  As with the prior meeting, during this meeting Shmiel Weingarten called Mayer Rosner to discuss the kidnapping.  (*Id.*).  The plan was to take Jane and John from a Hanukah celebration that was planned to occur the following day in Woodridge, New York.  (*Id.*).  After the meeting, Shimon Malka delivered a cellphone to Jane to

enable her to communicate with the kidnappers.  (*Id.*).  Jane was aware that the kidnappers were making efforts to take her back to Lev Tahor and she intended to go with them.  (*Id.*).

The following day—Friday, December 7—Sara and her kids travelled from Brooklyn up to Woodridge, New York to attend a holiday celebration at a family friend's home that was scheduled to occur from Friday evening through Saturday evening.  (*Id.* ¶ 25).  Shimon Malka was also attending the celebration, and part of the kidnapping plan was for him to help get Jane and John out of the house when the other kidnappers came to pick them up.  (*Id.*).  The same day, Nachman drove from Philadelphia to Woodridge and met up with Shmiel Weingarten and Mordechay Malka at a motel that was near the house where Sara and her children were staying. (*Id.*).

### D. December 2018: Helbrans Leads the Kidnapping of Jane and John Doe and Flees With the Children to Mexico

Sometime between 2 AM and 3 AM on the morning of December 8, Shimon Malka learned from Shmiel Weingarten that it was time for him to wake up John.  (*Id.* ¶ 26).  At 2:56 AM on December 8, Jane and John walked outside of the house to the getaway car, the Nissan Rogue rented by Mordechay Malka. (*Id.*).   Helbrans, Shmiel Weingarten, and Mordechay Malka were waiting in the car.  (*Id.*).

Jane and John were then driven to the motel where they changed into the disguises that the kidnappers had purchased for them at Walmart.  (*Id.* ¶ 27).  From there, the group drove to Scranton International Airport.  (*Id.*).  Once at Scranton airport, Helbrans used airplane tickets that were in his own children' names as documentation for Jane and John.  (*Id.* ¶ 28).  Helbrans, Jane, and John went through security.  (*Id.*).  Jane and John were instructed by Helbrans to provide airport security with his own children's names when asked to identify themselves.  (*Id.*).  Using these fake names,

Jane and John passed through security and boarded the flight with Helbrans.  (*Id.*).  They then took three domestic flights before landing in San Antonio and then driving across the border to Mexico.

Once in Mexico, Helbrans took Jane and John to a hotel in Mexico City called Hotel Cozumel.  (*Id.* ¶ 29).  Mayer Rosner, Jacob Rosner (Jane's husband), and other members of Lev Tahor met them at the hotel shortly thereafter.  (*Id.*).  Soon afterward, the group traveled to a house in the country in Mexico where they stayed until December 18, 2018, when Mexican law enforcement raided the home and arrested Helbrans, Rosner, Jacob, and Matityau Malka, another member of Lev Tahor,.  (*Id.* ¶ 29, 31).  During the raid, Jane and John hid in the closest in the house and were not found by Mexican law enforcement.  (*Id.* ¶ 31).

After the raid, two other members of the Hanhala—Yoil and Shmiel Weingarten—came and retrieved Jane and John.  (*Id.* ¶ 32).  Law enforcement located the children shortly thereafter and recovered them on December 27, 2018 with Yoil and Shmiel Weingarten.  (*Id.*).  Jane and John were then reunited with their mother and brought back to Brooklyn.  (*Id.*).

### E. March 2019: Helbrans Again Attempts to Kidnap Jane While Imprisoned on Kidnapping Charges

A few months later, in March 2019, Helbrans tried again to kidnap Jane.  (*Id.* ¶ 33).   This time around, Helbrans worked with Yakov Weingarten and Matityau Malka to remove Jane from her mother.  (*Id.*).  Multiple Lev Tahor operatives, including Matityau Malka, brought phones to Jane in an effort to facilitate her communication with members of the Hanhala about a plan to kidnap her again.  (*Id.*).  In addition, a member of Lev Tahor brought Jane prescription pills that were sedatives with hypnotic qualities.  (*Id.*).  When Sara learned what was happening, she started speaking directly with Yakov Weingarten and Helbrans.  (*Id.*).  On those calls, Nachman and Yakov threatened that they would take her children and Yakov told Sara that they would fight her until "the last drop of blood."  (*Id.*).

## PROCEDURAL HISTORY

As relevant here, Superseding Indictment S3 19 Cr. 497 (NSR) (the "Indictment") was filed on September 28, 2021, charging Helbrans with (i) conspiracy to transport a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a); (ii) conspiracy to travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b); (iii) conspiracy to commit international parental kidnapping, unlawfully use a means of identification, and enter by false pretenses to any secure area of any airport, in violation of 18 U.S.C. § 371; and (iv) three counts of international parental kidnapping, in violation of 18 U.S.C. § 1204 (two counts in connection with the December 2018 kidnapping of Jane and John Doe and one count in connection to the March 2019 attempted kidnapping of Jane Doe).  Trial began on October 25, 2021, and, on November 10, 2021, the jury returned a guilty verdict as to all six counts in the Indictment.  The defendant has been remanded since his arrest following deportation from Mexico to the United States on December 28, 2018.

On February 1, 2022, the Probation Office issued the Presentence Report ("PSR").  (Docket No. 451).  The Probation Office calculated a total offense level of 40, as follows. Counts One through Four and Count Six were grouped together with a base offense level of 28,  pursuant to U.S.S.G. § 2G1.3(a)(3).  The offense level was increased by two levels, pursuant to U.S.S.G. § 2G1.3(b)(1)(A), because the defendant is a relative of the minor victim; increased by two more levels, pursuant to U.S.S.G. § 2G1.3(b)(2)(B), because the defendant unduly influenced a minor to engage in prohibited sexual conduct; two more levels were added, pursuant to U.S.S.G. § 3A1.1(b)(1), because the victims were unusually vulnerable after their unique upbringing in the Lev Tahor community; another two levels were added, pursuant to U.S.S.G. § 3B1.4, because the defendant used the minor victims to commit the offense; and the offense level was increased by four more levels, pursuant to USSG § 3B1.1(a), because the defendant was a leader of the criminal

conspiracy involving five or more participants.  (PSR ¶¶ 39–50).  Given that this Group resulted in the greater of the adjusted offense levels, the offense level was set at 40.  (PSR ¶¶ 57–58). Helbrans has no criminal history, rendering a Guidelines range of 292 to 365 months, to be followed by five years' supervised release.  The Government agrees with the Probation Office's calculation.   The Probation Office recommended a Guidelines sentence of 292 months' imprisonment.  (PSR at 23).

On March 17, 2022, counsel for Helbrans filed a letter moving "to adopt and join the arguments made in the Defense Objections to the Presentence Report [doc. 474] filed by counsel for co-defendant Mayer Rosner."  (Dkt. No. 475).  On March 22, 2022, counsel for Helbrans filed his sentencing submission (Dkt. No. 493 ("Def. Ltr")), and once again moved to join Rosner's objections to the PSR, albeit implicitly conceding that two enhancements apply: (i) the leadership enhancement, pursuant to U.S.S.G. § 3B1.1(a); and (ii) an enhancement for a defendant who is a relative of the minor victim, pursuant to U.S.S.G. § 2G1.3(b)(1)(A).  (Def. Ltr. at 1-2)

In its sentencing letter for Rosner, the Government already addressed, at length, the arguments raised by his counsel regarding Rosner's objections to the PSR.  (*See* Dkt. No. 498). To the extent Helbrans raises the same legal objections as Rosner with respect to the application of the Guidelines, the Government will not repeat each of its responses here but instead incorporates its responses by reference.  Furthermore, to the extent Helbrans raises any factual objections with respect to the application of the Guidelines, his sentencing letters are highly conclusory and insufficient to provide the Court and the Government with any notice as to the substance of those objections.   Accordingly, the Court should adopt the Probation Office's Guidelines analysis in full.

**DISCUSSION**

I.    **Applicable Law**

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). District courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall* v. *United States*, 552 U.S. 38, 49 (2007). As described *supra*, under the Sentencing Guidelines, the defendant is subject to an effective sentencing range of 292 to 365 months' imprisonment.

After that calculation, however, the Court must consider not only the Guidelines, but also the six other factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing (as set forth below); (3) "the kinds of sentences available"; (4) any relevant policy statement by the Sentencing Commission; (5) "the need to avoid unwarranted sentence disparities among defendants"; and (6) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *Gall*, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

A Guidelines sentence for the defendant is sufficient but not greater than necessary to accomplish the purposes laid out in 18 U.S.C. § 3553(a).  In particular, the seriousness of the offenses, the history and characteristics of the defendant, the need to promote respect for the law, the need to protect the public, and the importance of achieving deterrence all support the imposition of a Guidelines sentence in this case.

## II.    A Significant Incarceratory Sentence Is Warranted

### A.  The Nature and Circumstances of the Defendant's Crimes

The seriousness of the offenses warrants a Guidelines sentence.  Helbrans led a team of operatives in the brazen kidnapping of a 14-year-old girl and a 12-year-old boy from their mother. The children were taken from their mother and siblings in the middle of the night and smuggled into Mexico by Helbrans.  The purpose of this kidnapping was clear: to return the children to Helbrans' control in Lev Tahor  and to reunite the 14-year-old Jane with her adult husband so that their sexual relationship would resume.  (Trial Tr. 610).  This was the same husband to whom Jane was forced to marry at the age of 13—at Helbrans' and the Hanhala's direction—and with whom Jane was required to have sex by Helbrans and the Lev Tahor leadership.  (PSR ¶ 23).  Upon Jane's return to Lev Tahor, the sexual relationship between Jane and her adult husband would have continued with the goal of procreation, despite her young age.

Helbrans, as the leader of Lev Tahor, instigated, planned, and spearheaded the kidnapping scheme.  He supervised and directed the involvement of at least eight other coconspirators to facilitate his goal of removing Jane from her mother's care and returning her to her adult husband. As the top leader of Lev Tahor and the ringleader of the plot, Helbrans oversaw weeks of careful planning for the kidnapping, including the taking of an oath of silence, the purchasing of disguises

and burner cellphones, multiple transfers of funds, and the booking of international flights under false identities. Helbrans then sat in the getaway car as Jane and her brother were taken from their mother in the middle of the night. Helbrans was not content to let others do his dirty work for him; he personally escorted the children on several flights as they made their way to the Mexico-U.S. border and crossed by bus into Mexico. (*Id.* ¶ 26–28).

Helbrans knew that by removing Jane and John from their mother's care he was violating a Kings County Family Court order that granted the mother custody. (*Id.* ¶ 20). It is marker of the seriousness of the crime that Helbrans nevertheless chose to abduct the children. And, in fact, during the precise period of the kidnapping, Helbrans and his leadership team were endeavoring to move the Lev Tahor community to Iran, which would have only further placed distance between the mother and her children and ensured that the children would remain outside the reach of U.S. law enforcement. (Trial Tr. 1689). This is only the latest in a string of jurisdiction-hopping by Helbrans and the Hanhala—from Israel to Canada to Guatemala—all in an effort to ensure that child protective services and law enforcement do not interfere with their unlawful conduct.

The egregiousness of Helbrans' conduct is only compounded by the fact that the kidnapping of Jane was, at least in part, for the purpose of returning the innocent young children to the control of Helbrans and Lev Tahor. Moreover, had Helbrans succeeded in his attempts, Jane would have faced years of a continued illegal marriage to her adult husband and the total control of all aspects of her life, including sex, by Helbrans and his leadership team. Helbrans has a history of wielding complete authority over the Lev Tahor community, and these kidnappings—and, indeed, his involvement in all aspects of family life in the community—were efforts to maintain his absolute control over Lev Tahor and its most vulnerable members—namely, women and children. Helbrans perceived a threat to this power by his sister Sara and her willingness to remove

her kids from the community and start a new life in New York. And so, Helbrans repeatedly took it upon himself to kidnap the children and remove them to another country all for the purpose of returning the kids to his control and Jane to an arranged, child marriage that involved illegal, underage sex with an adult man. A Guidelines sentence is therefore necessary to provide just punishment to the defendant for his serious criminal conduct.

### B. History and Characteristics of the Defendant

The history and characteristics of the defendant cut in favor of a Guidelines sentence. While this is Helbrans' first criminal conviction, he has had a troubling history as the leader of an organization that engages in physical, psychological, and sexual abuse of its most vulnerable members. When Helbrans assumed the leadership of Lev Tahor—following his father's death— he seized total control over the group and embraced even more militant practices, including closer monitoring of members, more frequent beatings, stricter dietary rules among the already malnourished group, and forced marriages for 12 and 13-year-olds. (*Id.* ¶ 14-16). Helbrans and the Hanhala regularly split up families and used his control over family life in the community as a lever of power. (*See* Trial Tr. 630, 659). Moreover, Helbrans fully appreciated the nature of his illegal conduct. He would officiate weddings for child marriages in secret in order to hide the age of the brides. (Trial Tr. 623). And when the prescribed sex for Lev Tahor's child brides resulted in pregnancy, Helbrans would order the young mothers-to-be to give birth in tents to hide their ages from the outside world. (*Id.* ¶ 15–16; Trial Tr. 669). Accordingly, Helbrans' history and characteristics militate in favor of a Guidelines sentence.

### C. The Need to Promote Respect for the Law

A substantial sentence is needed to promote respect for the rule of law. Helbrans has long manifested a deep disrespect for the laws of the United States and other countries. His efforts to conceal the marriages of young girls to adult men and their resulting pregnancies are indicative of

an awareness of the illegality of this practice.  His kidnapping of Jane was carried out to ensure the 14-year-old was returned to a community where underage sex was required.  He was so desperate to keep Jane under the control of the Lev Tahor community that, along with other members of the Hanhala, Helbrans instructed Jane—as he had done with other children in Lev Tahor—to lie to the authorities if she was taken from Lev Tahor.  (PSR ¶ 18).  Needless to say, instructing a child to lie to law enforcement manifests an incredible disrespect for the law. Helbrans showed once more his utter disregard for the rule of law when he kidnapped Jane and John in direct violation of the Kings County Family Court order and Sara Helbrans' parental rights as their mother. (*Id.* ¶ 20).  This court order meant nothing to Helbrans.

Further underscoring his disregard for the law, Helbrans and his co-conspirators employed a wide range of clandestine and illegal steps to mask their illicit conduct.  From the very outset, Helbrans demanded an oath of silence from his operatives—a promise to never talk about the kidnapping.  (*Id.* ¶ 23). The kidnappers then engaged in numerous evasive measures during the kidnapping, including disguises, drop phones, multiple ways of transferring money, multiple modes of transportation, code names, and safe houses.  (*Id.* ¶ 24—27).  Helbrans himself shepherded the kidnapped children through airports across the United States using disguises and false identities to avoid law enforcement scrutiny. (*Id.* ¶ 28).  His co-conspirators were also careful to take different routes to Mexico to further stymie law enforcement.

Helbrans' arrest for the kidnapping was not enough for him to understand the seriousness of his crimes.  For one, Jane and John were not located until nine days after Helbrans was detained by Mexican authorities in December 2018. (*Id.* ¶ 31—32).  And then, a mere three months after his arrest, and while incarcerated on kidnapping charges in Westchester County Jail, Helbrans once again showed utter disregard for the law and the charges against him by coordinating another

kidnapping attempt of Jane.  Lev Tahor operatives supplied burner phones and hypnotic drugs to Jane in an effort to remove her once again from her mother.  That the defendant instructed subordinates—people dependent on him for religious and spiritual guidance—to commit this crime, and that he did so from jail, makes the conduct here even more problematic and the need for a sentence that promotes respect for the law even more apparent.

### D.  The Need for Adequate Deterrence and To Protect the Public

The need for specific and general deterrence, and to protect the public, supports a sentence in the Guidelines Range.  Helbrans poses a significant risk of committing additional dangerous crimes should he ever be released from prison.  Indeed, as noted above, while in Westchester County Jail in March 2019, he again attempted to commit the exact crime for which he was already incarcerated.  (*Id.* ¶ 33).  Helbrans' own words during this episode manifest both his resolve and the need for a deterrent sentence here.  After co-defendant Yakov Weingarten told Sara that he would fight her "until the last drop of blood," Helbrans called his sister and delivered a chilling threat: "The children (UI), if it should happen that you don't see them, you should know that Nachman will again (UI), either he got and did it himself, or he, once again, (UI) and one could do nothing about it."  (GX 324 ATI).  Helbrans was telling Sara, in no uncertain terms, that if her kids vanished again, know that he was behind it.  And the subsequent kidnapping attempt—organized by Helbrans from jail and involving burner phones and hypnotic pills delivered to Jane—makes clear that this statement was not mere puffery.  That the defendant remained wholly undeterred and continued his criminal conduct after his arrest only underscores the seriousness of his offenses, his utter disregard for the law, and the need for a serious sentence to deter him.

The risk of recidivism is especially high here in light of Helbrans' refusal to take any ownership for his slew of illegal conduct.  As noted by the Probation Department, Helbrans "has not clearly demonstrated acceptance of responsibility." (PSR ¶ 38). Instead:

> It is clear that the defendant believes he has done nothing wrong with regards to the instant offense. He believes he was returning a wife to her husband so they could continue their relationship and procreate. The defendant believes not only that there is nothing wrong with an early-teenage female marrying an adult and being essentially forced to have sexual relations, he also does not believe there is any issue with him taking the child away from her mother and smuggling her into Mexico.

(PSR at 24);  (*see also* PSR ¶ 89 (noting that Helbrans "continues to [] believe he is innocent")).

Moreover, Helbrans' unapologetic support for underage sexual relationships and his unsuccessful defense at trial that he was merely "rescuing the children"—an argument that is untethered to the facts and predicated on a string of lies—suggests that he would repeat his efforts the day he is released from prison, if not sooner.  And as the Probation Office noted, "[t]he victims in this case are not the only children who remain at risk of the defendant's actions and the reach of Lev Tahor." (PSR at 23).  Indeed, if the defendant were released today, there is little doubt that he would re-assume his leadership role in Lev Tahor and have no qualms about continuing the practices of sexual and emotional abuse that underlie the charges in this case.  As a result, the risk of recidivism and the need to protect the public weigh in favor of incapacitating the defendant through a lengthy prison sentence.

A strong message of general deterrence should also be sent to those considering taking children away from their parents. Helbrans' repeated attempts to capture Jane underscore the importance of general deterrence. The Court should therefore send a strong message that kidnapping children carries serious consequences.

### E.  Helbrans' Sentencing Arguments Do Not Warrant A Reduced Sentence

In his sentencing submission, Helbrans seeks a sentence of 120 months' imprisonment. (Def. Ltr. at 1).  In requesting a sentence far below the Guidelines range, Helbrans principally advances three arguments: (i) he is not a pervert or sex trafficker and did not commit his offenses

18

for power or money, (*id.* at 2); (ii) his lack of a criminal history and his history and characteristics, (*id.* at 4); and (iii) his physique, (*id.* at 5). These arguments do not move the needle.

First, Helbrans' argument that he's not a pervert or a sex trafficker is hardly mitigating given the aggravating factors here, including that (i) Jane was only one of many child brides that Helbrans and the Hanhala forced into illegal child marriages and illegal child sex; (ii) Helbrans and the Hanhala ruled Lev Tahor with an iron fist, separating families at a whim to retain power; (iii) Helbrans and the Hanhala weaponized that control to pressure Jane—a minor—to lie to law enforcement and the family court, to pretend her mother beat her, and to participate in her own kidnapping; (iv) Helbrans was seeking to move the community to Iran at the time of the kidnapping to further his illegal conduct outside the reach of law enforcement; (v) Helbrans continued to try to kidnap Jane, even after his initial arrest; and (vi) Helbrans has shown no remorse. Moreover, the Government disputes Helbrans' contention that he was not seeking power in committing his crimes. (Def. Ltr. at 2). Helbrans and the Hanhala constantly used sex, marriage, and family separations to further their power and assert their authority. Indeed, one can argue that the entire kidnapping was Helbrans' and Rosner's response to being openly challenged by Sara. By gaining custody of Jane in a New York family court, Sara was standing in the way of Jane and Jacob continuing their sexual relationship under the rules of Lev Tahor. More pointedly, she was standing in the way of Helbrans' and Rosner's absolute control. They couldn't let this threat to their hegemony stand. So they took matters—and the law—into their own hands and planned an illegal kidnapping. Helbrans' argument that "[h]is is not the background of someone who turned to criminality for power," (Def. Ltr. at 2) thus rings hollow.

Next, Helbrans seeks leniency on the basis of his lack of a criminal record and his history and characteristics. (Def. Ltr. at 4). This argument falls short for several reasons. For one, the

Guidelines range already appropriately reflects Helbrans' lack of criminal history.   Second, Helbrans' lack of criminal history should not be confused with him lacking a history of  criminal conduct.  Far from living an "exemplary life" (Def. Ltr. at 4), for years, Helbrans fostered countless child marriages in violation of Canadian, Guatemalan, and U.S. law, and facilitated—and, from 2017 onward, reigned over—a brutal and punitive culture in Lev Tahor.   Furthermore, the Hanhala's *modus operandi* for decades has been to move from jurisdiction to jurisdiction to evade law enforcement and child protection authorities. Thus, Helbrans' lack of a criminal record merely reflects the Hanhala's capacity to evade scrutiny by constantly being on the move.  Finally, this entire argument is premised on the logic that because a defendant has not previously committed crimes, his offense conduct was merely the result of a singular lapse in judgment, and he is therefore unlikely to return to a life of crime if offered a more lenient sentence.   Here, the Government submits that Helbrans' refusal to accept responsibility and his unapologetic posture should provide the Court with no confidence that he will not be a recidivist.  Indeed, far from accepting any responsibility, Helbrans "wants the Court to know that he continues to believe in his innocence," "that his prosecution and the prosecution of his compatriots, has been a prosecution for his religious beliefs," and "the government's excoriation of the religious community, Lev Tahor . . . has been an un-veiled attempt to punish him for religious practices." (Def. Ltr. at 2).  In light of Helbrans' refusal to acknowledge the wrongness of his acts, his lack of a formal criminal history should have little bearing on the Court's assessment of an appropriate sentence.

Finally, the defendant argues that his "small physique" militates in favor of a below-Guidelines sentence.  (Def. Ltr. at 5).  Notably, Helbrans was not concerned about the "small physiques" of the 12- and 13-year-old girls he was forcing into sexual relationships with adult men.  In any event, Helbrans' frailness due to his diet does not rise to the level of a physical

condition that should impact his sentence.[1]   "Physical condition is not ordinarily relevant to determining whether [a] defendant should receive a departure from the applicable guideline range." *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (citing U.S.S.G. § 5H1.4). However, "a departure is permitted for a physical impairment where such a factor is present 'to an exceptional degree.' " *United States v. Jimenez*, 212 F.Supp.2d 214, 216 (S.D.N.Y. 2002) (quoting *Koon v. United States*, 518 U.S. 81, 95-96 (1996)).   If a court determines a departure is appropriate because the defendant has an "extraordinary physical impairment," the impairment must be one that renders the defendant "seriously infirm." *United States v. Workman*, 602 F. App'x 13, 15 (2d Cir. 2015); *compare Jimenez*, 212 F. Supp. 2d. at 219 (finding the defendant's condition, including "Amnestic Disorder and psychotic hallucinations consequent on brain aneurism" warranted departure, especially given her "condition serious erodes her capacity to threaten society"), *with United States v. Marcano*, 74 F. App'x 108, 109-10 (2d Cir. 2003) (summary order) (affirming district court's refusal to depart downward pursuant to U.S.S.G. § 5H1.4 despite the defendant's "constant numbness, extreme shooting pain, muscle loss, and the ability to stand, all in his right leg" resulting from old gunshot wounds); *United States v. Knowles*, No. 17 Cr. 672 (WFK), 2019 WL 1306109, at *9–10 (E.D.N.Y. Mar. 20, 2019), *aff'd,* 794 F. App'x 134 (2d Cir. 2020) (denying departure for defendant with serious physical and psychological conditions).   Here, Helbrans has not established that his small physique is an "extraordinary physical impairment," or that it renders him "seriously infirm," thus warranting any differential treatment at sentencing.  *Workman*, 602 F. App'x at 15.  Indeed, Helbrans has been incarcerated for more than 39 months and the Government is not aware of any incidents where his

---

[1] As his submission makes clear, Helbrans is "not moving for a downward departure from the guidelines on these grounds, but rather ask that the Court consider his physical condition as an 18 USC §3553 factor that warrants a below guidelines sentence."  (Def. Ltr. at 5).

physique made "him unusually susceptible to harm in prison." (Def. Ltr. at 5.) Accordingly, this argument should not carry any weight in determining the defendant's sentence.

**F.  The Court Should Impose a $50,000 Fine and a $5,000 JVTA Special Assessment**

As recommended by the Probation Office, the Court should also impose a fine of $50,000 and a JVTA special assessment of $5,000. (*See* PSR at 22).

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "The burden of establishing inability to pay rests on defendant." *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)).

The defendant has not met his burden of establishing that he is unable to pay a fine. In fact, Helbrans failed to provide *any* information regarding his finances to the Probation Office, even failing to provide release forms to a credit agency. (PSR ¶¶ 94-95, 98); *see United States v. Sasso*, 59 F.3d 341, 352 (2d Cir. 1995) (given that defendant "was not forthcoming with respect to his financial circumstances, it was well within the province of the district court to find that he had not carried his burden of proving inability to pay"). Probation therefore noted that "[a]s the defendant has not provided financial documentation, he has not demonstrated an inability to pay a fine nor has he demonstrated an inability to pay the $5,000 JVTA assessment." (PSR ¶ 98). Accordingly, in light of the defendant's failure to meet his burden on this issue, the balance of the Section 3553(a) considerations described herein warrant the imposition of a fine that will serve as not only appropriate additional punishment, but also as a critical component of the general deterrence message resulting from the upcoming sentencing.

**CONCLUSION**

For the foregoing reasons, the Government asks the Court to impose a sentence in the Guidelines range of 292 to 365 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.


Dated: March 24, 2022
       White Plains, New York


                              DAMIAN WILLIAMS
                              United States Attorney
                              Southern District of New York

                    By:      _____/s/_____

                              Sam Adelsberg
                              Jamie Bagliebter
                              Jim Ligtenberg
                              Daniel Tracer
                              Assistant United States Attorneys
                              (212) 637-2494  / 2236 /
                              (347) 758-0247